[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff (hereinafter the husband) and the defendant (hereinafter the wife) were married on June 21, 1970, in Westport, Connecticut. Their only child, Katherine Scavo, is now twenty-one years old, a junior at Fairfield University and living with the wife. She has reached majority; therefore, neither parent has the legal duty to support her.
Both parties testified that the marriage has broken down irretrievably with no hope of reconciliation. They have been living apart for the past six years. Therefore, a decree of dissolution is granted pursuant to § 46b-40 (C)(1) of the General Statutes.
Some of the background facts are not in dispute. At the time of the marriage, the husband was a physician with an established medical practice in Bridgeport with a specialty in otolaryngology, an eye, ear, nose and throat surgeon. At the time of the marriage, the wife was a licensed practical nurse and came into the marriage without any assets except a new car. Shortly after the marriage, their daughter was born, and with the husband's approval, the wife became a full time homemaker and mother until she moved out of the marital home in 1988.
During the first six years, the parties were happy and enjoyed a comfortable lifestyle. They purchased a large ten room home in Easton on five acres which was lavishly furnished. A large barn was remodeled to house the husband's racing cars, a hobby that he enjoyed. They belonged to a country club. The wife testified that the husband was very generous, buying her jewelry and expensive clothes, and that he worked very long hours in his practice to provide these comforts.
Both testified that about 1976 the marriage began to deteriorate. The husband formed a racing team that raced on weekends, adding stress and expenses. According to the wife's testimony, he started drinking to excess on weekends, would abuse her emotionally in public and was constantly degrading her in front of other members of the racing team. The wife admitted CT Page 5102 having an extramarital affair with a member of the husband's racing team in 1979 which lasted about six months. That member had witnessed the husband's verbal abuse of the wife and had treated her kindly, which precipitated the affair. The wife told the husband about the affair and suggested they seek marital counseling which he refused to do. In 1981 the husband filed a complaint for divorce which he subsequently withdrew and they reconciled. The husband was critical of the wife's spending habits for clothes, jewelry and home furnishings. Nevertheless, he felt justified in spending over $175,000 sponsoring an auto racing team because he gained pleasure from this hobby.
The wife stated she wanted the marriage to succeed, but testified that the husband's violent temper and drinking caused their arguments to become more frequent. The husband was arrested twice for driving while intoxicated. In 1985, on the night the wife graduated as a registered nurse in 1985, which the husband paid for, he tried to throw her out a window and then pushed her to the floor. The Monroe police came to the house, and they suggested that the wife and their twelve year old daughter leave to avoid violence. There were a number of other occasions between 1984 and when she left in 1988 when the husband pushed the wife, threw pots and pans at her and was verbally abusive. On these occasions, the wife and daughter went to live temporarily with the wife's mother.
The husband claims that he was emotionally decimated when his wife admitted to having an affair. He was so depressed he saw a psychiatrist and claims that this affair was the cause for the breakdown of the marriage. On the other hand, he was "no saint" and also admitted to having an extramarital affair which began in 1982 and ended in April, 1993.
The testimony of the wife was responsive and more credible than the husband's. While the wife's one affair may have contributed to the breakdown, the primary cause was the husband's violent temper, his assaultive behavior and the emotional abuse to the wife. His excessive drinking of alcohol, together with his eleven year extramarital affair were also contributing factors. See Emanuelson v. Emanuelson, 26 Conn. 527 and Cahn v. Cahn,26 Conn. 720.
Fault, however, is only one of the factors which the court must consider in determining what orders it should issue in a dissolution proceeding. When making an award of alimony or the CT Page 5103 assignment of property, the court is required to consider the following factors under §§ 46b-81 and 46b-82 of the General Statutes: ". . . the length of the marriage, the causes for the . . . dissolution of the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties." No one factor is controlling. The relevant considerations vary from case to case and depend upon the circumstances of the parties.Chamblis v. Chamblis, 171 Conn. 278, 279 (1976).
Before deciding the issues in contention, the following orders may enter by agreement:
1. REAL ESTATE:
 (a) The wife shall transfer to the husband by quitclaim deed all her right, title and interest in and to the real property located at 55 Sherwood Road, Easton, Connecticut. The husband shall take said real property subject to the first mortgage and home equity loan (second mortgage) thereon and shall indemnify and hold harmless the wife with respect to same.
 (b) The husband shall remain the sole owner of the real property located at 47 Sawyer Drive, Cudjoe Key, Florida, subject to the first mortgage thereon and any encumbrances thereon and shall indemnify and hold harmless the wife against same.
 (c) The wife shall remain the sole owner of the condominium known as Cay Condominiums located at 601 West Ocean Drive, Key Colony Beach, Florida, subject to the first mortgage thereon and shall indemnify and hold harmless the husband against the same.
2. PERSONAL PROPERTY
 (a) The husband shall remain the sole owner of all of the automobiles listed on his financial affidavit, and the wife shall be the sole owner of all of the automobiles listed on her affidavit. Each shall be responsible for any outstanding loans for an automobile he or she retains.
(b) Each party shall retain any checking and/or savings CT Page 5104 accounts in his or her respective name.
 (c) The accounts receivable collected from the sale of the husband's medical practice estimated to be worth between $40,000 to $45,000 shall be divided equally between the parties.
 (d) The parties shall be entitled to keep the household furniture and furnishings in his or her possession. The items in contention listed in the husband's claims for relief shall be referred to Family Relations for mediation. In the event agreement cannot be reached on these items, the parties shall return to court.
 (e) The parties shall be liable for the debts and liabilities which are listed on their respective financial affidavits except for the wife's legal fees, which shall be addressed separately in this decision.
There are two primary issues for the court to decide: (1) the equitable distribution of marital assets and (2) alimony. The husband's claims for relief urge the court to assign all or a substantial portion of the assets to him primarily because they were acquired from his earnings or inherited from his mother. The wife's claims for relief urge the court to assign two thirds of the cash and liquid assets to her and one third to the husband. As to alimony, the husband claims that each should received $1.00 a year nominal alimony while the wife requests lifetime alimony of $800 per week reviewable in five years.
A. ASSIGNMENT OF ASSETS
The court may assign to either party all or any part of a marital asset after it has considered all the criteria in § 46b-81 (c) of the General Statutes. The division of property is to give to each party what is fair and equitable. Rubin v. Rubin,204 Conn. 224, 228 (1987).
In assigning property rights under § 46b-81 of the General Statutes, the court must consider the length of the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each party. Leo v. Leo, 197 Conn. 1, 5 (1985), and the opportunity of each for the future acquisition of capital assets and income and the contribution of each party to the acquisition, CT Page 5105 preservation or appreciation in value of the asset.
B. ALIMONY
The court may also order periodic alimony to either party and, again, must consider all the factors set forth in General Statutes § 46b-82, the alimony statute, which are similar to § 46b-81, the assignment statute. The primary reason for alimony is to continue the duty to support a spouse and not to punish either party. Tobey v. Tobey, 165 Conn. 742, 748 (1974);Leo v. Leo, 197 Conn. 1, 5 (1985).
 To begin with, our alimony statute does not recognize an absolute right to alimony, General Statutes § 46b-82; Thomas v. Thomas, 159 Conn. 477, 487, 271 A.2d 42 (1970); `This court has reiterated time and again that awards of financial settlement ancillary to a marital dissolution rest in the sound discretion of the trial court.' (Citation omitted.) Although the court is required to consider the statutory criteria of length of marriage, causes for dissolution, the age, health, station in life, occupation, amount and sources of income, assets and opportunity for future acquisitions of assets of each of the parties, (citation omitted), no single criterion is preferred over all the others. In weighing the factors in a given case, the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. Valente v. Valente, 180 Conn. 528, 530 (1980); Watson v. Watson, 221 Conn. 698, 710 (1992).
In dividing the remaining assets, the court has considered that the wife received a net positive equity of $53,500 on the exchange of the real estate based on agreed values. The wife's financial affidavit lists about $5,600 in liquid or cash assets, while the husband's lists $517,222, which includes the stock valued at $71,526 inherited from his mother's estate about four years ago, two years after the wife moved out of the marital CT Page 5106 home. These assets were not acquired by the earnings or effort of either party. The nonmonetary efforts of the wife as homemaker and mother are not relevant to dividing this stock. Therefore the following order shall enter:
1. The husband shall remain the sole owner of the stock inherited from his mother valued at $71,526 and held by Tucker-Anthony, Inc.
It is undisputed that the balance of liquid or cash assets, about $445,696, were acquired by the husband's earnings. The court has considered all the statutory factors, including the length of the marriage, the employability, and the future needs of each party as well as their ability to acquire future assets. After the parties separated in 1988 the wife and their daughter rented a four room apartment while the husband continued to live in the ten room marital home in Easton. After working six years as a clerk-receptionist, the wife earns a gross annual salary of $28,000. The husband's annual earnings averaged at least $225,000 during the past ten years or more. There was conflicting testimony on when and why the husband retired. From all the testimony, the court finds that his retirement on February 25, 1994 was voluntary and, in part, for the purpose of avoiding paying his wife alimony. His argument of needing all the assets for his retirement was self-serving. The court must consider the wife's contributions to this twenty-three marriage as well as her present needs.
The court finds that the wife's nonmonetary contributions as homemaker and mother during the first eighteen years of this marriage not only enabled the husband to acquire these assets but were at least equal to his monetary contributions. In O'Neill v. O'Neill, 13 Conn. App. 300, 311, our Supreme Court stated:
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable CT Page 5107 distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities.
The court enters the following order:
2. The parties shall share equally ($222,848 each) the balance of the husband's liquid assets of $445,696 as listed on his financial affidavit. They include $178,000 cash held in escrow by the attorneys, a Keogh pension plan of $167,696, and $100,000 owed from the sale of the medical practice to Dr. Borghesan. This $100,000 debt shall be divided equally as it becomes due and payable. The wife's counsel shall prepare a Qualified Domestic Relations Order ("QDRO") transferring 50 percent of the Keogh plan to the wife.
On his financial affidavit, the husband listed his current income at $43 a week. His weekly expenses were $2,710.45 or about $140,000 a year. The wife's affidavit lists monthly income of $1,708.68 and expenses of $10,118.40. From these affidavits, both parties must drastically reduce their lifestyle from when the husband's adjusted gross income was between $230,000 to $278,000 a year (Exhibits A, B, C, 1990-1992 Federal Income Tax Returns), which decreased to $131,000 in 1993 because he was planning to retire (defendant's Exhibit 4).
The husband claims he retired because of physical and mental problems. He testified that he has high blood pressure, an irregular heart beat and migraine headaches. He admitted having these ailments for over ten years and was able to perform surgery full time until he sold his practice to Dr. Borghesan in December, 1993. In 1982 the husband was hospitalized for five weeks because of an aneurysm to the aorta, which required a prosthesis that he described was the "size of a garden hose"; nevertheless, he practiced surgery full time for the following twelve years. He claimed his back problem curtailed his ability to do long surgical procedures.
Dr. Scavo's testimony on why he retired was ambivalent. He testified of being tired of practicing medicine, detested managed health care and hated the insurance companies that controlled his fees. He also testified that his physical and emotional problems prevented him from doing surgery. He presented CT Page 5108 no medical expert on the issue of his disability or inability to practice medicine. In 1992 the defendant warned his wife to start saving money because he was going to retire. When the court ordered $600 a week temporary alimony in 1993, Dr. Scavo was sporadic in paying it. At one time he was $7,100 in arrears. On another occasion, he sent her $600 in pennies. His reason was to teach her the value of a dollar by counting 60,000 pennies. He admitted to not wanting to pay her one cent in alimony. The only testimony offered to prove his physical and psychological disability was his own testimony, which was obviously self-serving. The court finds that he failed to sustain the burden of proof on this issue of his inability to practice medicine.
During the trial, the husband changed his testimony on important issues. He claimed his memory failed him from one day to another. For example, on direct examination he testified leaving $30,000 in escrow in January, 1994 with a Florida contractor to do certain demolition work on his Florida home. On cross-examination, he admitted that these funds instead were being held by a Ms. Dorothy Johnson, his next door neighbor in Florida, whom he met two years ago. She testified to having his Power of Attorney to hire and supervise contractors to do the work. During the trial, Ms. Johnson stayed with him in the Easton home and had previously stayed there on a number of occasions. She described herself as his friend and was most supportive of him. She recently sold him her 1993 Volvo for $25,000 and was willing to wait for payment until this case was resolved. She testified that Dr. Scavo's $25,000 check dated January 4, 1994 payable to Fair Volvo, a Florida dealer, was destroyed at her suggestion. She felt that Dr. Scavo should use the $25,000 for dental work he needed instead of paying her. The court found the testimony of Dr. Scavo deceptive and disjointed on these issues.
A $100,000 recorded mortgage from Dr. Scavo to Kathleen Williams on this Florida home dated November 12, 1992 was also deceptive. He never received any money or other consideration from Ms. Williams, but gave it to limit his liability on advice of counsel. Ms. Williams was not sure whether the mortgage was enforceable and planned to consult an attorney before releasing it.
Doubt and suspicion was raised by Dr. Scaro's paying creditors over $210,000 in cash for both personal and business debts from his business account. The court found a great deal of CT Page 5109 his testimony to be unresponsive, deceptive and his loss of memory self-serving.
This court may grant alimony awards on earning capacity especially where a spouse reduces his income or retire voluntarily as in this case. Hart v. Hart, 19 Conn. App. 91, 94Venuti v. Venuti, 185 Conn. 156 (1981). The husband has an outstanding reputation as a physician and surgeon for over thirty years. He could find a position as a consultant, teach or find employment in a hospital or clinic. The court finds the husband present earning capacity is between $100,000 and $150,000, and he has the ability to pay a reasonable alimony award to the wife The court finds no basis to award the husband $1.00 a year alimony because he should be able to support himself.
The wife is 49 years of age and in good health, earning $28,000 a year as a clerk-receptionist. She should be able to rehabilitate herself within the next three years to meet reasonable living expenses. She can supplement her earnings with the $222,848 of liquid assets assigned to her by this judgment. Invested at six percent, it should yield additional income of about $12,000 annually. She could also increase her earning capacity from $28,000 to between $40,000 to $45,000 a year as a registered nurse. The court believed the testimony that a registered nurse can earn about $25 an hour. The wife could take refresher courses in nursing during the next three years to be so employed. Being in good health, she should be able to support herself to a reasonable lifestyle on her earnings and income. Neither she nor the husband will be able to live the higher lifestyle they maintained during the marriage.
The court has considered all the legislative mandates in § 46b-81, § 46b-82 and § 46b-62 and further finds and orders as follows:
1. ALIMONY: The husband shall pay to the wife $600.00 per week as periodic alimony from the date of this judgment and continuing for three years thereafter, nonmodifiable as to term and amount during this time. At the end of the three years, alimony shall be reduced to $1.00 a year because Dr. Scavo will be nearing 65, a normal age of retirement. The alimony shall cease on the death of either party or the remarriage or statutory .cohabitation of the wife.
The husband shall also immediately pay any pendente alimony CT Page 5110 arrearage due the wife.
2. ATTORNEY'S FEES: The husband is to contribute the sum $15,000 towards the balance of the wife's attorney's fees $56,228.76, which the court finds fair and reasonable balance on the extraordinary time and effort required, include discovery, to litigate this case. The court realizes the said attorneys were previously paid $10,000 from the sale the husband's medical practice. The court finds that total contribution of $25,000 provides a more equitable distribution of the marital assets after considering all criteria in § 46b-62 of the General Statutes and does undermine the other financial orders entered. Emanuelson v. Emanuelson, 26 Conn. App. 527
3. The husband shall be entitled to all refunds from prior income tax returns.
4. The husband shall retain his one-fourth ownership interest Hearings and Balance Diagnostics and be responsible for liabilities therefrom.
5. The husband has deposited $30,000 in escrow with a Ms. Dorothy Johnson for work to be performed on his Florida has to pay for demolition and renovations required governmental authorities. The husband also claims he will pay Mrs. Johnson $25,000 for a 1993 Volvo she sold him. husband gave conflicting accounts relative to both the obligations. The husband shall provide proof to the court that these debts have been paid within six months from the date of this judgment; otherwise, the court reserves jurisdiction to issue further orders as to these funds.
Judgment shall enter in accordance with the foregoing orders.
ROMEO G. PETRONI, JUDGE